UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LARRY B., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:18 CV 783 JMB |
| | ) |
| ANDREW M. SAUL,[1] | ) |
| Commissioner of Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This action is before the Court pursuant to the Social Security Act, 42 U.S.C. §§ 401, *et seq.* ("the Act"). The Act authorizes judicial review of the final decision of the Social Security Administration ("Administration") denying Plaintiff's application for Disability Insurance Benefits ("DIB"). All matters are pending before the undersigned United States Magistrate Judge with consent of the parties, pursuant to 28 U.S.C. § 636(c). The matter is fully briefed, and for the reasons discussed below, the matter will be remanded for additional proceedings.

## Procedural History

On November 23, 2015, Plaintiff filed an application for DIB under the Act. Plaintiff alleged a disability onset date of November 4, 2014. Plaintiff's application was denied initially on February 18, 2016, and he thereafter requested a hearing before an Administrative Law Judge ("ALJ"), which was held on November 7, 2017.

The administrative hearing was conducted using video conferencing. Plaintiff appeared

---

[1] After this case was filed, Andrew M. Saul was confirmed as the Commissioner of Social Security Administration. Pursuant to Fed. R. Civ. P. 25(d), Andrew M. Saul is substituted for Deputy Commissioner Nancy A. Berryhill as the defendant in this suit.

with counsel. Plaintiff testified in response to questions posed by the ALJ as well as his attorney. Dr. Thomas Bott,[2] a Vocational Expert ("VE") testified regarding Plaintiff's past work and in response to hypothetical questions posed by the ALJ. In a written decision dated February 14, 2018, the ALJ denied Plaintiff's application for benefits. In a notice dated Marcy 27, 2018, the Appeals Counsel for the Administration denied Plaintiff's request for review. Therefore, the ALJ's decision stands as the final decision of the Administration in this matter. Accordingly, Plaintiff has exhausted his administrative remedies and the matter is properly before this Court.

## Administrative Record

**I.**     **General**

Broadly speaking, in November 2014, Plaintiff experienced what the record consistently refers to as a transient ischemic attack ("TIA"), and Plaintiff alleges that he has been disabled since that time. Prior to his alleged disability, Plaintiff worked as a truck driver and before that as a paramedic and an EMT. Plaintiff was 45 years old on his date last insured, which was December 31, 2017.

In a Disability Report – Adult (Tr. 230-38), Plaintiff's medical conditions are listed as: weakness on the left side of his body; headache; high blood pressure; dizziness; and blurred vision. (Tr. 231) The index of the administrative transcript, prepared and submitted by the Administration in this matter (ECF No. 11-2), indicates that this Disability Report was dated November 30, 2015. In a Function Report – Adult (Tr. 262-69), dated December 16, 2015, Plaintiff listed various information about his conditions and his living situation, and provided information relative to his ability to carry out various activities associated with daily living.

---

[2] The transcript of the administrative hearing lists the VE's last name as "Bot" (phonetically) but the administrative record in this matter includes Dr. Bott's CV in which his name is spelled as referenced herein.

Broadly speaking, most of the limitations Plaintiff listed related to physical issues, such as limitations relating to lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, seeing, and using his hands.

## II. Summary – Pertinent Medical Records and Opinion Evidence

The Court has fully considered the entire record, but summarizes and discusses only specific aspects herein to provide context for this memorandum and order. Because the Court believes that this matter must be remanded so that the Administration may fully weigh and consider all relevant opinion evidence, a full summary of the record is not necessary.[3]

Dr. Julia Zevallos, M.D., a neurologist, began a treatment relationship with Plaintiff in December 2014. (Tr. 347-425, 490-94) At or near the outset of her treatment, Dr. Zevallos prepared a "To Whom It May Concern" letter, dated December 5, 2015. (Tr. 347) In that letter, Dr. Zevallos represented that she had been treating Plaintiff for "severe back and neck pain, with neurological deficits, including numbness and tingling." Dr. Zevallos opined that Plaintiff was not able to return to work due to his pain, noting that she ordered tests to assist in diagnosing the source of his problems.

Dr. Zevallos continued to treat Plaintiff over the following months and she completed a "Physical Capabilities Evaluation" form, dated April 7, 2015. (Tr. 376-79) On the first page of the form, Dr. Zevallos reported that Plaintiff could not return to work at the time and indicated an approximate return to work date of June 1, 2015, but also noted that it was "unknown" whether his return would be full or part time. The form also included a series of checklists that

---

[3] Plaintiff alleges a disability onset date of November 4, 2014. That date corresponds to records showing that he was admitted to Mercy Hospital Jefferson, in Festus, MO, on November 5, 2014, for a possible TIA, with left-side blindness with numbness. (Tr. 304-07) The record includes numerous instances in which Plaintiff received treatment and testing for what the Court will refer to generally as TIA symptoms and concerns. The record also includes references to a possible diagnosis of multiple sclerosis which later testing did not confirm. (Tr. 719)

3

reflected Dr. Zevallos's assessment of Plaintiff's abilities to carry out basic work-related tasks.

Plaintiff also received treatment for his various physical conditions at Quality Health Care of Desloge, MO, from Dr. Stephen Forsythe and Kimberly Yeager, a Nurse Practitioner. (Tr. 522-33, 558-77) Many of the treatment notes are signed by Nurse Practitioner Yeager. On March 24, 2015, Nurse Practitioner Yeager completed a Guardian Group Disability Claims form entitled "Physical Capabilities Evaluation."[4] (Tr. 333-34) It was a checklist form that assessed Plaintiff's ability to perform various specific work-related tasks, based on frequency during a workday (i.e., never, occasionally, frequently, and continuously). The form also included an assessment of other work-related environmental considerations such as, for example, the ability to work at heights or be exposed to vibration or dust. The restrictions noted on the form by Nurse Practitioner Yeager were extensive. For example, she limited Plaintiff to sitting, standing, and walking to one hour during a workday. Nurse Practitioner Yeager did not provide any significant explanations for the restrictions, and she noted that the restrictions would last for an "unknown" duration. (Tr. 334)

### III. **Administrative Hearing** (Tr. 27-59)

The ALJ held an administrative hearing on November 7, 2017. Plaintiff appeared with his attorney. The VE also testified. Plaintiff answered questions in response to the ALJ and his attorney.

Plaintiff testified regarding his education and past work, which included driving a truck, both locally and nationally. Plaintiff also worked as a paramedic and an EMT. At times, his past work required him to lift heavy objects, including people and boxes.

Plaintiff testified regarding his treatment with Dr. Zevallos and Nurse Practitioner Yeager

---

[4] The Physical Capabilities Evaluation forms used by Dr. Zevallos and Nurse Practitioner Yeager appear to be the same.

and reviewed his medications. Plaintiff testified regarding his activities and represented that he seldom left his home. He indicated that he experienced knee and back pain, as well as balance issues and that he was often "out of wind." (Tr. 37) Plaintiff also stated that he seldom drives a car due to the stress of the situation, his general weakness, and lack of stamina. Plaintiff explained that physical exertion "skyrockets" his blood pressure. (Tr. 41) According to Plaintiff, when his blood pressure rises, his vision deteriorates (he sees spots) and he loses function in one side. (Tr. 42-43) Plaintiff testified that he had difficulty sitting for extended periods and that, as he was sitting for the hearing, his lower back hurt bad. Plaintiff explained that he went from bed, to a recliner, and back to bed when he was no longer comfortable in the recliner. He described his weakness as "a profound generalized weakness" and that he experiences a headache 100% of the time, "[t]hey never go away." (Tr. 45, 46) Plaintiff testified that he has memory issues and is easily distracted. Near the end of the hearing, Plaintiff testified that Nurse Practitioner Yeager said she was not going to release him to work.

The VE testified regarding Plaintiff's past work and in response to hypothetical questions posed by the ALJ. The VE testified that a hypothetical person, limited to light work (with other limitations) would not be able to return to Plaintiff's past work. The VE further testified, however, that such an individual could still perform other work available in the national economic, including companion, nursery school attendant, and gate guard. (Tr. 52-53) The VE also testified that a hypothetical person limited to sedentary work and the previously identified limitations would be able to work as a sorter, information clerk, or food checker. The VE was also asked about various additional considerations, such as whether any of the jobs he listed required frequent fingering or handling. The VE testified that a person off task ten percent of the workday or who required frequent breaks (in addition to regular work breaks) would be excluded from all jobs.

5

**IV.    ALJ's Decision** (Tr. 10-21)

In a decision dated February 14, 2018, the ALJ concluded that Plaintiff was not disabled under the Act, and thus not entitled to Disability Insurance Benefits for the time period covering his alleged disability onset date of November 4, 2014, through his date last insured of December 31, 2017. The ALJ followed the five-step, sequential process in evaluating Plaintiff's claim. At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity during the relevant timeframe. At step two, the ALJ found that Plaintiff had the severe impairments of: hypertension, TIA; left lobe infarct; hyperlipidemia; obesity; cervicalgia; and migraine headaches. (Tr. 12) The ALJ found Plaintiff's lipoma, luminal irregularity, degenerative changes in the hips and lumbar spine, and history of right foot crush were not severe because they caused no more than minimal vocationally relevant limitations. The ALJ noted that Plaintiff received only infrequent and conservative treatment for these non-severe impairments.

Regarding listings, the ALJ found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled any listing. The written decision indicates that the ALJ specifically considered Listing 2.00, regarding Plaintiff's vision limits, Listing 4.00, regarding Plaintiff's cardiovascular limits, and Listing 11.00, regarding Plaintiff's neurological limits.

Based on the entire record, the ALJ concluded that Plaintiff had retained the residual functional capacity ("RFC") to perform light work, with the following additional limitations: he can never climb ladders, ropes, or scaffolds; he can never be exposed to unprotected heights or hazardous work environments; he can no more than occasionally climb ramps or stairs; he can no more than frequently balance; he can no more than occasionally stoop, kneel, crouch or crawl; he must avoid concentrated exposure to bright flashing or flickering lights; he must avoid nose above a moderate level (as defined by Appendix D of the Selected Characteristics of Occupations); he must avoid concentrated exposure to vibration, extreme cold, and extreme heat;

6

and he must be able to be off task five percent of the workday.

In determining Plaintiff's RFC, the ALJ considered Plaintiff's activities and subjective complaints. The ALJ summarized the relevant medical records, including the treatment records of neurologists Dr. Zevallos and Dr. John McGarry, M.D. Regarding Plaintiff's subjective complaints, the ALJ found that, while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; … [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 18) In discounting Plaintiff's subjective complaints, the ALJ specifically considered the medical records, the records of Drs. Zevallos and McGarry, the overall conservative nature of Plaintiff's treatment, and his activities of daily living. Regarding Plaintiff's reports of frequent TIAs, after reviewing the records, the ALJ found that Plaintiff's symptoms were typically short-lived, his work-ups were generally unremarkable, and he was discharged relatively quickly. The ALJ also found that Plaintiff's reports of multiple TIAs weekly was "dramatically inconsistent with the medical evidence of record as noted by [Drs. Zevallos and McGarry]." (Tr. 16)

In reaching the Administration's decision to deny benefits, the ALJ considered the opinions of Dr. Zevallos and Nurse Practitioner Yeager. The ALJ acknowledged that Dr. Zevallos was Plaintiff's treating neurologist but gave her opinions only "limited weight." The ALJ's decision states that "Dr. Zevallos opined that [Plaintiff] would not be able to return to work due to his pain and that she had ordered testing to determine the reason he has pain." (Tr. 18) The ALJ identified three reasons for discounting the weight of that opinion. First, the ALJ noted that Dr. Zevallos rendered her opinion on the first day she treated Plaintiff, and therefore found that her opinion was less persuasive because it did not relate to any "longitudinal functioning or the result of an extensive treatment relationship." (Id.) The ALJ next concluded

that Dr. Zevallos's later testing and pattern of treatment was "conservative without escalating modalities, and her physical examinations" did not support the limitations. (Tr. 18) As for Dr. Zevallos's opinion that Plaintiff could not return to work, the ALJ noted that was an administrative issue reserved to the Commissioner.

The ALJ also gave limited weight to Nurse Practitioner Yeager's opinions, noting that a nurse practitioner is not an acceptable medical source, the opinions of which might be used to establish a medically determinable impairment, or be considered as a medical opinion or a treating source opinion. (Tr. 18-19, citing 20 C.F.F. § 404.1513, 416.913(a)) The ALJ also observed, however, that Nurse Practitioner Yeager's opinions could be relevant to the severity of Plaintiff's impairments and how those impairments affect Plaintiff's ability to function. The ALJ gave Nurse Practitioner Yeager's opinions limited weight because her treatment of Plaintiff was generally conservative without escalating modalities and her examinations did not support the limitations. The ALJ found Nurse Practitioner Yeager's opinion that Plaintiff was unable to drive until his weakness resolved to be more persuasive.

At step four, and in consideration of the VE's testimony, the ALJ found that Plaintiff was not able to return to his past relevant work. The ALJ found Plaintiff to be a younger individual with at least a high school education. At step five, based on Plaintiff's age, education, work experience, work skills, and RFC, and in view of the VE's expert testimony, the ALJ found that Plaintiff could perform work that existed in substantial numbers in the national economy, and identified the following representative occupations: companion; nursery school attendant; and gate guard. Accordingly, the ALJ concluded that Plaintiff was not disabled during the relative time period.

## Discussion

### I. Issues Presented for Review

Plaintiff raises two issues for consideration. Plaintiff first argues that the ALJ's assessment of his RFC lacks substantial evidentiary support because the ALJ improperly evaluated the opinion evidence and, as a result, failed to include appropriate limitations regarding the use of his arms and his ability to sit, stand, or walk. Plaintiff also argues that the ALJ was required to, but did not, use the special Psychiatric Review Technique to evaluate his alleged mental impairments brought on by his TIAs and left lobe infarct.

### II. Standard of Review and Analytical Framework

To be eligible for DIB benefits, a claimant must prove that he is disabled within the meaning of the Act. See Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

Per regulations promulgated by the Commissioner, the ALJ follows a five-step process in determining whether a claimant is disabled. "During this process the ALJ must determine: '1) whether the claimant is currently employed; 2) whether the claimant is severely impaired; 3)

whether the impairment is, or is comparable to, a listed impairment; 4) whether the claimant can perform past relevant work; and if not 5) whether the claimant can perform any other kind of work.'" Andrews v. Colvin, 791 F.3d 923, 928 (8th Cir. 2015) (quoting Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006)). "If, at any point in the five-step process the claimant fails to meet the criteria, the claimant is determined not to be disabled and the process ends." Id. (citing Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005)); see also Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011).

A district court's review of an ALJ's disability determination is intended to be narrow and courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole. See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008). Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Reece v. Colvin, 834 F.3d 904, 908 (8th Cir. 2016); Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id. Specifically, in reviewing the Commissioner's decision, a district court is required to examine the entire administrative record and consider:

1. The credibility findings made by the ALJ.
2. The claimant's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the claimant's impairments.

6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (citation omitted).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also Chaney v. Colvin, 812 F.3d 672, 676 (8th Cir. 2016); McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

### III. Discussion and Analysis of Issues Presented for Review

Plaintiff contends that the ALJ's assessment of his RFC is not supported by substantial evidence. The Eighth Circuit has explained that

> [a claimant's] RFC "is the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). Although it is the ALJ's responsibility to determine the claimant's RFC, 20 C.F.R. §§ 404.1545(a); 404.1546(c), the burden is on the claimant to establish his or her RFC. Andrews v. Colvin, 791 F.3d 923, 928 (8th Cir. 2015). The RFC determination must be supported by some medical evidence. Myers v. Colvin, 721 F.3d 521, 527 (8th Cir. 2013).

Buford v. Colvin, 824 F.3d 793, 796 (8th Cir. 2016). See also Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011). The determination is "'based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of

his limitations.'" Boyd v. Colvin, 831 F.3d 1015, 1020 (8th Cir. 2016) (quoting Moore v. Astrue, 527 F.3d 520, 523 (8th Cir. 2009)).

The focus of Plaintiff's argument regarding his RFC is that the ALJ did not properly weigh and consider the opinions of his treating providers, Dr. Zevallos, a neurologist, and Nurse Practitioner Yeager. It is well established that a treating physician's opinion is normally given "controlling weight," but only if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record." Reece v. Colvin, 834 F.3d 904, 908 (8th Cir. 2016) (citations and internal quotations omitted). Thus, "[a]lthough a treating physician's opinion is usually entitled to great weight, it do[es] not automatically control, since the record must be evaluated as a whole." Id. (citations and internal quotations omitted). Whether the ALJ gives the opinion of a treating physician great or little weight, the ALJ must give good reasons for doing so. Id. (citing 20 C.F.R. § 404.1527(d)(2)).

In his written decision denying benefits, the ALJ summarizes Dr. Zevallos's opinion as follows: "Dr. Zevallos opined that [Plaintiff] would not be able to return to work due to his pain and that she had ordered testing to determine the reason he has pain." (Tr. 18) The ALJ provided three reasons for assigning that opinion limited weight. First, the ALJ noted that Dr. Zevallos rendered that opinion on her first day of treatment, thus it was "less persuasive" and "not indicative of any longitudinal functioning or the result of a treatment relationship." (Id.) Second, the ALJ noted that Dr. Zevallos's subsequent testing was conservative and did not involve escalating modalities. Finally, the ALJ found that Dr. Zevallos's opinion regarding Plaintiff's ability to return to work usurped an ultimate issue reserved for the Commissioner. The ALJ concluded, "[t]hese inconsistencies render Dr. Zevallos' opinions[] unpersuasive." (Id.)

Among other things, Plaintiff contends that the ALJ erred in weighing Dr. Zevallos's opinions because the ALJ's decision does not address all of Dr. Zevallos's opinions. The undersigned agrees with Plaintiff.

The medical record before the Court includes two opinions from Dr. Zevallos, only one of which is acknowledged in the ALJ's written decision. The first opinion was Dr. Zevallos's "To Whom It May Concern" letter, dated December 5, 2014, (Tr. 347) which is the opinion the ALJ's decision specifically addresses. Several months later, however, Dr. Zevallos prepared a more detailed opinion, which included her assessment of numerous workplace-related abilities. That detailed opinion is dated April 7, 2015. (Tr. 377-78) The April 7, 2015, assessment is not specifically referenced in the ALJ's decision.

If the only opinion evidence in the record from Dr. Zevallos was the December 5, 2014, letter, the undersigned would have no difficulty concluding that the ALJ's treatment of that opinion finds substantial support in the record. But that was not the only opinion provided by Dr. Zevallos and the ALJ's decision does not adequately reference and consider the April 7, 2015, opinion, which Dr. Zevallos prepared after she had treated Plaintiff for several months.

It appears to the Court that the ALJ (or the ALJ's written decision) overlooked Dr. Zevallos's April 7, 2015, assessment and the opinions therein. It may be that, had the ALJ specifically considered those opinions, the outcome of this case would not change. The Court cannot say, however, that the omission of any reference to that later opinion reflects a harmless error in opinion writing because two of the three reasons given for discounting Dr. Zevallos's December 5, 2014, opinion do not apply at all to Dr. Zevallos's later assessment and the opinions contained therein. Specifically, the ALJ discounted Dr. Zevallos's December 2014 opinion because that opinion was rendered at the outset of the treating relationship and because the opinion encompassed an ultimate question of disability. Dr. Zevallos's April 2015 opinions

were rendered well into the treating relationship and focus on numerous, discrete areas of functioning in the workplace.

Furthermore, the timing of Dr. Zevallos's April 2015 opinions may also be relevant. The ALJ also considered the opinions of Nurse Practitioner Yeager. Nurse Practitioner Yeager's opinions were in a "Physical Capabilities Evaluation" form dated March 24, 2015—two weeks before Dr. Zevallos's April opinions. Nurse Practitioner Yeager's evaluation considered the same areas of workplace functioning that Dr. Zevallos considered in her April 2015 assessment. It may be that, when viewed together, the opinions of Dr. Zevallos and Nurse Practitioner Yeager would, in fact, influence the ALJ's assessment of Plaintiff's RFC.

For the foregoing reasons, the undersigned finds that, the ALJ's decision does not adequately address or explain the reasons for discounting the opinions given in Dr. Zevallos's April 7, 2015, evaluation. See Reece, 834 F.3d at 908. Therefore, the ALJ's RFC determination lacks substantial support.

Plaintiff also contends that he suffers from mental health deficits, including memory loss, as a result of his TIAs. Plaintiff argues that the ALJ erred because he should have used the Psychiatric Review Technique to evaluate Plaintiff's mental impairments. Because this matter will be remanded so that the ALJ can evaluate and fully weigh all opinion evidence in the record, Plaintiff's Psychiatric Review Technique argument will not be addressed. On remand, the ALJ should specifically address whether Plaintiff's established impairments require the ALJ to consider the special Psychiatric Review Technique.

## Conclusion

For the foregoing reasons, Plaintiff's argument that the ALJ erred in formulating his RFC and addressing the opinion evidence in this case is sustained. The ALJ's decision regarding Plaintiff's RFC is not supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and the matter is remanded pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings. A separate Judgment shall be entered this day.

    /s/ ***John M. Bodenhausen***
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of September, 2019.